AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**SEALED**

| | | |
|---|---|---|
| **FILED** | | |

**FILED**

**May 20, 2025**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
| Jessa Zayas aka Jessa Contreras | ) |
| | ) |
| | ) |
| | ) |
| | ) |

Case No.

**1:25-mj-00058-EPG**

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   June 2023 through February 2025   in the county of   Fresno   in the

Eastern   District of   CA and elsewhere  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1347 | Health Care Fraud |

This criminal complaint is based on these facts:

See the attached affidavit of FBI Special Agent Cori Orr, which is incorporated by reference as though fully set forth herein.

☑ Continued on the attached sheet.

_Complainant's signature_

Cori Orr, FBI Special Agent

_Printed name and title_

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date:   **May 20, 2025**

_Judge's signature_

City and state:   Fresno, CA

Hon. Erica P. Grosjean, U.S. Magistrate Judge

_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

### I.    INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of a criminal complaint and arrest warrant charging JESSA ZAYAS with health care fraud in violation of 18 U.S.C. § 1347.

2.    I am a Special Agent with the FBI and have held this position since 2022.  I am a graduate of the FBI's Basic Field Training Program in Quantico, Virginia, and am currently assigned to the Fresno, California, office where I am a member of the white-collar crime unit.  I have been involved in several criminal investigations involving health care fraud, investor fraud, embezzlement, and other financial crimes.  My duties include interviewing victims, witnesses, and suspects, executing searches for evidence, consulting with various types of experts, drawing conclusions based on my review of the evidence, making arrests, and testifying in court proceedings.  Prior to joining the FBI, I obtained a Bachelor of Science in Accountancy and a Master of Business Administration from Northern Arizona University.  I was also an auditor at a large public accounting firm for two and a half years.

3.    The facts set forth in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses involved in this investigation. The affidavit is intended to show that there is probable cause for the requested complaint and arrest warrant.  It does not set forth all of my knowledge about the investigation.

### II.    APPLICABLE LAW

4.    Pursuant to 18 U.S.C. § 1347, anyone who knowingly and willfully executes, or attempts to execute, a scheme or artifice to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of a health care benefit program, shall be imprisoned for up to ten years and fined up to $250,000.

### III.    STATEMENT OF PROBABLE CAUSE

5.    The FBI and United States Department of Health and Human Services, Office of Inspector General, are investigating allegations that Jessa Zayas aka Jessa Contreras ("ZAYAS")

executed a scheme to defraud Medicare. As discussed below, ZAYAS is the Chief Executive Officer of two hospice providers, Healing Hands Hospice Inc. ("HEALING HANDS") and Humane Love Hospice ("HUMANE LOVE"). From June 2023 through February 2025, she caused HEALING HANDS and HUMANE LOVE to bill Medicare for millions of dollars' worth of hospice services that were not medically necessary, not authorized by a physician, and were not actually provided to the patients.

**A.      Relevant Background on the Medicare Program and Hospice**

6.      Based on my training and experience, Medicare is a federally funded health insurance program that primarily provides health insurance for individuals who are 65 years old and older. Title XVIII of the Social Security Act ("Act") established the Medicare program, and the program is administered by the Centers for Medicare & Medicaid Services ("CMS").

7.       Medicare covers various types of health care services, including hospice services. Act § 1812(a)(4) and (5).

8.      Based on my training and experience, CMS contracts with four Home Health and Hospice Medicare Administrative Contractors ("MACs") to process and pay hospice claims that are submitted to Medicare. At all relevant times, National Government Services Inc. ("NGS") was the MAC responsible for paying Medicare hospice claims in California.

9.      To qualify for hospice care under Medicare, a patient must be certified by a physician as being terminally ill, *i.e.*, having a life expectancy of six months or less assuming that the illness runs its normal course. Act §§ 1814(a)(7)(A) and 1861(dd)(3)(A) and 42 CFR §§ 418.20 and 418.3.

10.      A patient who is qualified to receive hospice care under Medicare is entitled to receive care for two 90-day periods followed by an unlimited number of 60-day periods. 42 CFR § 418.21(a). Generally speaking, at the start of the initial 90-day period, the hospice provider must obtain written certification of the patient's terminal illness from the patient's primary care provider and the hospice provider's medical director. For subsequent periods, the hospice provider only needs to obtain a written certification from its medical director. 42 CFR §

418.22(c). The certifications must include an explanation of why the patient's life expectancy is six months or less. 42 CFR § 418.22(b)(3). These certifications are generally referred to as Certifications of Terminal Illness ("CTI"). 42 CFR § 418.22(a)(1).

### B.    ZAYAS' Involvement with HUMANE LOVE and HEALING HANDS

11.    I identified ZAYAS based on California DMV records that I last searched in May 2025. Below is her current driver's license photograph:



12.    Based on government surveillance conducted in May 2025, ZAYAS currently resides at a house in Santa Clarita, California. According to the California Department of Consumer Affairs website that I last reviewed in May 2025, ZAYAS is licensed as a vocational nurse by the California Board of Vocational Nursing and Psychiatric Technicians. Based on my training and experience, a vocational nurse is an entry-level health care provider who is responsible for rendering basic nursing care under the direction of a physician or registered nurse.

13.    According to Statements of Information that were filed with the California Secretary of State for HEALING HANDS and that I reviewed, HEALING HANDS is a California corporation that was first registered with the state in January 2019. The company's principal place of business is an office building in Van Nuys, California, and ZAYAS has been

the Chief Executive Officer ("CEO") since November 2023. According to Medicare records, V.K. owned HEALING HANDS until April 2023 when he sold it to ZAYAS and others.

14.    According to Statements of Information that were filed with the California Secretary of State for HUMANE LOVE and that I reviewed, HUMANE LOVE is also a California corporation that was first registered with the state in June 2020.  Its principal place of business is in the same office building in Van Nuys as HEALING HANDS, and ZAYAS has been the CEO since November 2022. According to Medicare records, A.J. owned HUMANE LOVE until November 2022 when he sold it to ZAYAS.

15.    ZAYAS also signed Medicare Enrollment Applications on behalf of HUMANE LOVE and HEALING HANDS in December 2022 and April 2023, respectively.  In the applications, she agreed to the following statement, "My signature legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program."

16.    Importantly, based on internet searches that I have conducted, the office building in Van Nuys where HEALING HANDS and HUMANE LOVE purportedly have their principal places of business is listed as the address for over 20 different hospice providers.  Based on my training and experience, it is unusual and suspicious for that many hospice providers to be associated with the same office building.

17.    I also know from working with agents at the California Employment Development Department ("EDD") that the EDD collects wage information from employers every quarter so that it can detect if someone is fraudulently claiming unemployment insurance from the state. I obtained and reviewed EDD records for ZAYAS as of May 20, 2025.  Those records show that she sometimes goes by the name Jessa Contreras.  The records also show that from the last quarter of 2023 through the last quarter of 2024, she worked for the Los Angeles Unified School District and a company called Dynamic Nursing Services while also being the CEO of HEALING HANDS and HUMANE LOVE.  Finally, the records show that she had no reported wages for the first quarter of 2025 and therefore may currently be unemployed.  Based on my training and experience, it is unusual and suspicious that someone would be able to work

for a school district and nursing service while also leading hospice companies that have submitted millions of dollars in claims to Medicare as discussed below.

18.    Since ZAYAS became involved with HEALING HANDS and HUMANE LOVE, Medicare records show that Dr. J.W. has qualified and completed CTIs for most of their hospice patients. Specifically, he purportedly qualified and completed CTIs for 122 of the companies' 150 total hospice patients, or 81 percent.  The claims submitted to Medicare for these 122 patients totaled over $2,500,000.  Based on Medicare records and government interviews, many of the patients were in Fresno and other places in the State and Eastern District of California.

### C.    Case Origin

19.     This case began in September 2023 when a service coordinator at a Salvation Army Retirement Residence in Fresno reported to the FBI that representatives of HUMANE LOVE and HEALING HANDS were going door-to-door signing its residents up for hospice services even though the residents were not terminally ill. The service coordinator provided copies of flyers for HUMANE LOVE and HEALING HANDS that the representatives handed out to the residents. The fliers were identical in terms of content.

20.    The government interviewed the service coordinator and other members of the management team at the Salvation Army Retirement Residence. They explained that the representatives of HUMANE LOVE and HEALING HANDS entered the residence unannounced and after hours when most of the management team members were gone for the day, and that the representatives were not authorized to conduct business at the residence.

### D.    Patients Were Not Terminally Ill and Therefore Were Ineligible for Hospice

21.    The government interviewed five purported hospice patients for whom Dr. J.W. qualified and completed CTIs and for whom HEALING HANDS billed Medicare. The patients were A.I., C.C., M.M., R.G., and R.S., and they were all in Fresno and other places in the State and Eastern District of California. The claims for these patients were submitted to Medicare from August 2023 through February 2024 and totaled over $125,000.  The patients confirmed that they were not terminally ill and that they had not seen and did not know Dr. J.W. The

government also interviewed the patients' actual primary care providers. The primary care providers similarly confirmed that the patients were not terminally ill and therefore were ineligible for hospice care.

22.    The patients explained that either a nurse or sales representative had knocked on their doors and signed them up for hospice care by asking for their Medicare information.  After being enrolled, some of them received prescriptions and other medical equipment such as wheelchairs in the mail.  The patients further explained that, every few weeks, a nurse would visit them to take their blood pressure. They estimated that the visits lasted five minutes or less.

### E.    Dr. J.W. Confirmed the Fraud

23.     In February 2025, the government interviewed Dr. J.W. with his attorney present pursuant to a proffer agreement. A proffer agreement is an agreement where an individual provides information to the government regarding a criminal matter and, in exchange, the government agrees to limit the use of that information against the individual in any future criminal prosecutions.

24.    Dr. J.W. explained that he is a medical doctor in Fresno. He further explained that, around June 2023, his business partner told him that ZAYAS was looking for a medical director for HEALING HANDS and HUMANE LOVE. A few days later, he met with ZAYAS in the cafeteria at St. Agnes Medical Center in Fresno. ZAYAS brought physician service agreements for HEALING HANDS and HUMANE LOVE with her to the meeting and they reviewed and signed those agreements.

25.    Dr. J.W. confirmed based on physical descriptions and review of photographs that the ZAYAS I identified in California DMV records is the same person that he knew as ZAYAS and that he associated with HEALINGS HANDS and HUMANE LOVE.

26.     Dr. J.W. explained that HEALING HANDS and HUMANE LOVE paid him $84,000 from June 2023 through February 2025, but that he did not do much work for the companies.  The payments to Dr. J.W. were corroborated by bank records provided to the government in response to subpoenas.

27.    Dr. J.W. confirmed that he did not see any of HEALING HANDS or HUMANE LOVE's patients in-person and did not communicate with them directly.  Instead, all of his communications with the patients went through ZAYAS and other individuals who he believed worked for her.

28.    Dr. J.W. then reviewed the 122 hospice patients that he purportedly qualified and completed CTIs and for whom HEALING HANDS and HUMANE billed Medicare.  Dr. J.W. explained that he only qualified and completed CTIs for four of the patients and those patients were A.S., J.M., L.G., and R.G.[1] He did not qualify or complete CTIs for the remaining 118 patients.  He believed his identity had been stolen with regard to these patients.

29.    Dr. J.W. explained that he would receive documents to sign, including CTIs, from ZAYAS by fax.  Dr. J.W. believed that ZAYAS was the one who sent the faxes because, a few minutes before he received them, she would call to tell him they were on the way.

30.    Shortly after Dr. J.W.'s interview, his attorney informed the government that he had resigned from HEALING HANDS and HUMANE LOVE.

**F.    <u>ZAYAS and HEALING HANDS Provided False Documents to the Government During A Payment Review</u>**

31.    As previously discussed, NGS is the MAC responsible for paying Medicare hospice claims in California.  In March 2024, NGS issued a Notification of Post-Payment Provider Review and Request for Medical Records to HEALING HANDS.  NGS requested medical records for 20 hospice patients for whom HEALING HANDS had submitted claims to Medicare.

---

[1] As previously discussed, during Dr. J.W.'s interview with the government, he confirmed that he never saw any patients of HEALING HANDS or HUMANE LOVE in-person or otherwise communicate with them directly.  All of his patient communications went through ZAYAS and other individuals who he believed worked for her.  Therefore, I believe that Dr. J.W. qualified and completed CTIs for these four patients to receive hospice care based solely on information he received from ZAYAS and her associates, and that did not personally examine or otherwise meaningfully interact with them. Based on my training and experience, this may have been improper under the relevant Medicare rules and regulations.

32.     According to Medicare records, ZAYAS participated in two phone calls related to NGS' request in May 2024.  HEALING HANDS then produced the requested records by uploading them to an electronic portal. The records included CTIs for all 20 patients that NGS had identified. All of the CTIs were purportedly signed by Dr. J.W.

33.     During Dr. J.W.'s interview with the government, he explained that he only signed CTIs for 1 of the 20 patients that NGS had identified, and that patient was R.G.  Dr. J.W. confirmed that he did not sign the CTIs for the remaining 19 patients.

34.     Dr. J.W. also pointed out that his signatures on the CTIs for R.G. that were provided to NGS were different than his signatures on the CTIs that he actually faxed to ZAYAS. He provided the government with examples of his signatures to prove his point.  He did not know the reason for this discrepancy.

### G.     Electronic Health Records Show ZAYAS was Responsible for the Fraud

35.     Based on my training and experience, Data Soft Logic ("DSL") is a software company that provides electronic medical record technology to hospice providers. To use DSL's software, a person generally must create a user account.  DSL then tracks the amount of time that person is logged into his or her account.

36.     Records provided by DSL in response to subpoenas show that HEALING HANDS and HUMANE LOVE used DSL's software to create, manage, and store hospice records.  This included the fake CTIs that were purportedly signed by Dr. J.W. to falsely qualify patients for hospice care and that HEALING HANDS and HUMANE LOVE used to fraudulently bill Medicare.

37.     DSL records show that ZAYAS had user accounts for both HEALING HANDS and HUMANE LOVE with the username "je.zayas." From June 2023 through December 2024, she was logged into the accounts for over 5,000 hours.  While there were other users, I did not identify anyone else associated with HEALING HANDS or HUMANE LOVE who was logged-in for more time than ZAYAS.  DSL records also show that ZAYAS created several of the fake

CTIs that were purportedly signed by Dr. J.W.

38.     Dr. J.W. also had DSL user accounts for both HEALING HANDS and HUMANE LOVE, and he was logged into the accounts for over 25 hours. The accounts, however, were setup by ZAYAS and K.D.  According to the California Department of Consumer Affairs website, K.D. is licensed as a registered nurse by the California Board of Registered Nursing. And according to Statements of Information filed with the California Secretary of State and Medicare records, K.D. is the Chief Financial Officer and part owner of HEALING HANDS and HUMANE LOVE.

39.     During his interview with the government, Dr. J.W. confirmed he did not access or setup user accounts on the DSL software for HEALING HANDS and HUMANE LOVE.

**H.    Bank Records Further Show ZAYAS was Responsible for the Fraud**

40.     According to Medicare records, HUMANE LOVE receives electronic payments from Medicare to Chase Bank account ending 3937 ("HUMANE LOVE ACCOUNT") and HEALING HANDS receives electronic payments to Chase Bank account ending 8995 ("HEALING HANDS ACCOUNT").

41.     Bank records provided to the government in response to subpoenas show that ZAYAS has been a signer on the HUMANE LOVE ACCOUNT and HEALINGS HANDS ACCOUNT since December 2022 and July 2023 and that she was the President and Secretary of the companies, respectively.  The bank records also show that she withdrew over $70,000 from the HUMANE LOVE ACCOUNT and more than $30,000 from the HEALING HANDS ACCOUNT from May 2023 through September 2023.  She then deposited $115,000 into the HEALING HANDS ACCOUNT in October 2023. This is evidence that ZAYAS controls the proceeds of the fraud.

**I.    ZAYAS Used Cell Phones to Help Carry Out the Fraud**

42.     During Dr. J.W.'s interview with the government, he explained that ZAYAS used two different cell phones to call and text him.  ZAYAS told him that she had a personal cell phone with phone number ending 8722 ("Phone Number 8722") and a work cell phone with

phone number ending 7522 ("Phone Number 7522").

43.     Dr. J.W. explained that ZAYAS identified herself by name in text messages that he received from these phone numbers and that he would occasionally video chat with her using the phone numbers shortly after texting with her.  Dr. J.W. further explained that he would sometimes correspond with who he thought were other people that worked for ZAYAS using these phone numbers.

44.     Cell phone subscriber records provided by AT&T in response to subpoenas show that Phone Number 8722 has been registered to ZAYAS and that Phone Number 7522 has been registered to K.D from 2021 through at least January 2025, which is when the records were received by the government.

45.     Toll records provided by AT&T in response to subpoenas show that, from January 2023 through January 2025, over 1,000 calls were exchanged between Phone Number 8722 belonging to ZAYAS and Phone Number 7522 belonging to K.D. The toll records also show that, from January 2023 through May 2024, over 1,400 calls were exchanged between Phone Number 8722 belonging to ZAYAS and a phone number registered to J.P. This is significant because J.P. was identified by several of the patients that the government interviewed as being one of the nurses that came to take their blood pressure after they were fraudulently signed up for hospice care. This is evidence that ZAYAS used cell phones to carry out the fraud.

**J.     Text Messages Provided by Dr. J.W.**

46.     Dr. J.W. provided copies of the text messages that he exchanged with ZAYAS and others using Phone Number 8722 and Phone Number 7522. The text messages were dated from June 2023 through October 2024.  Nearly all of the text messages were unrelated to qualifying patients for hospice care. The text messages instead consisted of patient information and symptoms being sent to Dr. J.W. so that he could fill prescriptions for them.  Importantly, there were no text messages for most of the 118 patients that HEALING HANDS and HUMANE LOVE had falsely represented Dr. J.W. qualified for hospice care and fraudulently billed to Medicare using his name.

47.    Several of the prescriptions that Dr. J.W. filled were for controlled substances.[2]

## V.    SEALING REQUEST

48.    I request that the Court order all papers in support of the requested criminal complaint and arrest warrant for ZAYAS be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.

49.    Therefore, there is good cause to seal these documents because their premature disclosure may jeopardize the investigation, including by giving the targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee.

///

///

///

---

[2] As previously discussed, during Dr. J.W.'s interview with the government, he confirmed that he did not see any patients of HEALING HANDS or HUMANE LOVE in-person or otherwise communicate with them directly.  Instead, all of his communications with the patients went through ZAYAS and other individuals who he believed worked for her. Therefore, I believe that Dr. J.W. prescribed controlled substances for patients based solely on information he received from ZAYAS and her associates, and that did not personally examine or otherwise meaningfully interact with them.  Based on my training and experience, this may have been improper under the relevant rules and regulations for prescribing controlled substances.

1

## IV.    CONCLUSION

2      50.    For these reasons, I submit there is probable cause to believe that JESSA ZAYAS

3  committed health care fraud in violation of 18 U.S.C. § 1347 by causing patients to be falsely

4  qualified for hospice care and fraudulently billed to Medicare. I request that the Court issue a

5  criminal complaint and arrest warrant for her.

Respectfully submitted,

Cori Orr
FBI Special Agent

Approved as to form by:

Joseph Barton
Assistant United States Attorney

Affidavit submitted by email and pdf, and attested to me as true and accurate by telephone
consistent with Fed. R. Crim P. 4(d) and 4.1 on this _____20_____ day of May 2025:

Honorable Erica P. Grosjean
United States Magistrate Judge